UNITED STATES BANKRUPTCY COURT
EATERN DISTRICT OF LOUISIANA

IN RE:                                                    CASE NO. 16-10661

WHISTLER ENERGY II, LLC                                   SECTION "B"

     DEBTOR                                              CHAPTER 11

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

H. KENNETH LEFOLDT, AS TRUSTEE OF THE
WHISTLER ENERGY II, LLC LITIGATION TRUST

     PLAINTIFF

VERSUS                                                    ADV.P. NO. 18-1025

NABORS OFFSHORE CORP.

     DEFENDANT

## MEMORANDUM OPINION

This matter came before the court on March 26-28, 2019 as a trial on the complaint of H. Kenneth Lefoldt, as Trustee of the Whistler Energy II, LLC litigation trust (the "Trustee"), seeking to recover, under 11 U.S.C. § 547, from Nabors Offshore Corporation ("Nabors") payments made to the debtor, Whistler Energy II, LLC ("Whistler"), in the 90 days before the filing of an involuntary bankruptcy petition against Whistler. For the reasons set forth below, the court finds that Nabors has shown it is entitled to both an ordinary course of business defense under § 547(c)(2)(B), and a subsequent new value defense under § 547(c)(4), and the Trustee's complaint is dismissed.

**I.    Background Facts**

The Trustee's complaint seeks to recover $5,804,018.80 that was paid to Nabors between December 25, 2015 and March 24, 2016, i.e., the 90-day preference period before an involuntary

Chapter 11 bankruptcy petition was filed against Whistler.  Whistler and Nabors were parties to a platform drilling contract dated February 25, 2014, and Nabors provided drilling services and equipment to Whistler in connection with drilling two oil wells in the Gulf of Mexico.  The payments in question were all made pursuant to the contract between the parties.  There were four payments made during the preference period, and they are as follows:  1) one payment made by check in the amount of $496,634.62.  The check is dated January 28, 2016, and the debtor's bank records show that the check cleared on February 4, 2016; 2) a wire transfer made on February 8, 2016 in the amount of $1,500,000.00; 3) a wire transfer made on February 12, 2016 in the amount of $2,766,619.11; and 4) a wire transfer made on March 9, 2016 in the amount of $1,040,765.07.

The parties have stipulated that this court has jurisdiction over this suit.  At the outset of the trial, the parties informed the court that in their joint pre-trial order they stipulated that all elements required to establish a preference under § 547(b) had been met, and the Trustee rested his case.  The parties also stipulated that the requirement contained in § 547(c)(2) had been met.  Nabors then presented evidence on its ordinary course of business defenses under § 547(c)(2)(A) and (B), and its new value defense under § 547(c)(4).

## II.    Legal Analysis

### A.  Ordinary course of business defense under § 547(c)(2)(A) and (B).

Nabors raises defenses under both prongs of the ordinary course of business defense found at § 547(c)(2)(A) and (B), which provide the following:

> The trustee may not avoid under this section a transfer--
>  (2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was--
> (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or

(B) made according to ordinary business terms.

A creditor asserting an ordinary course of business defense must prove the elements by a

preponderance of the evidence. *In re SGSM Acquisition Co., LLC,* 439 F.3d 233 (2006). As

Nabors points out in its brief, there are two policy reasons underlying § 547. First, to discourage

creditors from "racing to the courthouse to dismember the debtor during his slide into

bankruptcy."[1] Second, to "facilitate the prime bankruptcy policy of equality of distribution

among creditors of the debtor."[2]

There is also a policy behind allowing the creditor to show that the transactions

were in the ordinary course of business:

> [T]he ordinary course of business defense provides a safe haven for a creditor
> who continues to conduct normal business on normal terms. Without this
> defense, the moment that a debtor faced financial difficulties, creditors would
> have an incentive to discontinue all dealings with that debtor and refuse to extend
> new credit. Lacking credit, the debtor would face almost insurmountable odds in
> its attempt to make its way back from the edge of bankruptcy.[3]

But, the court must also consider that sometimes creditors who continue to do business

with debtors can also put immense pressure on those debtors:

> The main purpose of the voidable-preference provision of the Bankruptcy Code is
> usually said to be to assure fair or equal treatment of creditors. But as so often,
> the invocation of fairness and equality--vague terms that they are—conceals a
> practical consideration. If there were no rule against preferences, an insolvent
> debtor, teetering on the edge of bankruptcy and besieged by creditors, might have
> an incentive to buy off the most importunate of his creditors, necessarily at the
> expense (the debtor being insolvent) of other creditors, in the hope of keeping
> afloat a little longer.[4]

Although the previous version of the Bankruptcy Code required a creditor to prove both

prongs A and B of § 547(c)(2), the 2005 Bankruptcy Abuse Prevention and Consumer Protection

---

[1] *In re Fuel Oil Supply & Terminaling, Inc.,* 837 F.2d 224, 227 n.8 (5th Cir. 1988).
[2] *In re T.B. Westex Foods,* 950 F.2d 1187, 1195 (5th Cir. 1992).
[3] *In re Gulf City Seafoods, Inc.,* 296 F.3d 363, 367 (5th Cir. 2002).
[4] *Matter of Xionics Imaging,* 837 F.2d 763, 765 (7th Cir. 1988).

Act ("BAPCPA") made it easier to invoke the ordinary course of business defense successfully in a preference action.[5]  BAPCPA changed the requirements so that the creditor claiming the ordinary course of business defense need only prove that the payments are made in the usual course of business between that creditor and the debtor, *or* that they are made in accordance with industry standards.  Cases decided before the amendments can still be relevant as to a specific part of the test, but they were decided based on the law as it was at the time.  Here, Nabors argues that both prongs apply, so the court will address them separately.

**1.  Section 547(c)(2)(A), or the "subjective" test.**

Subsection A requires the court to look to the course of dealings between the parties to determine whether the transaction was made in the ordinary course of their dealings with each other.  Courts traditionally look at a number of factors when making this determination including:  1) the length of time the parties were engaged in the transactions at issue; 2) whether the amount or form of tender differed from past practices; 3) whether the debtor or creditor engaged in any unusual collection or payment activities; and 4) the circumstances under which payment was made.[6]

**a.  Pre-preference period activity**

Nabors and Whistler entered into a platform drilling contract dated February 25, 2014.  The parties agree that from the beginning of the contractual relationship until September 11, 2015, Whistler made fairly regular payment of invoices within 30 or 35 days of the invoice (sometimes sooner) and paid the invoices in full.  Often multiple invoices were paid at a time with one check.  No one contends that there was any type of

---

[5]  5 COLLIER ON BAKRUPTCY ¶ 547.LH[5] (Richard Levin & Henry J. Sommer eds., 16th ed.).
[6]  *In re Torch Offshore, Inc.*, 2009 WL 2849028 (Bankr.E.D.La) *citing* 5 Collier on Bankruptcy (15th ed. Rev.) at ¶ 547[2][a].

collection activity during this period.  Things changed however, in that after making a payment on September 11, 2015, Whistler stopped making payments for several months. On November 24, 2015 Nabors sent Whistler a letter that stated it was a follow up to a meeting held the previous day, and that Whistler's account was "overdue for payment in the amount of $6,011,753.95."[7]  The letter went on to list the past due invoices individually.  The letter also referred to a request that Whistler had made for Nabors to lower the day rate to $45,000.00 per day.  Nabors stated it would accommodate this request if Whistler could bring its account current.  The last paragraph of the letter contains some collection language requesting that Whistler bring its account up to date no later than December 7, 2015.[8]  No payment was made by December 7, 2015, but the debtor did make a payment of $500,000.00 on December 15, 2015,[9] and a payment of $4,000,000.00 on December 18, 2015.  On December 23, 2015 Nabors drew on a letter of credit in the amount of $1,000,000.00 that Whistler had posted in favor of Nabors with an unspecified bank.[10]  Thus, during the two weeks before the preference period, Whistler made $5.5 million in payments to Nabors on its past due account.

---

[7]  Trial Exhibit 19.

[8]  It states:

> NABORS also wishes to advise WHISTLER that NABORS will take all actions available under the Agreement, and at law, to secure payment from Whistler.  However, to provide WHISTLER with an opportunity to take additional actions to bring its account up to date, before NABORS avails itself of its rights under the Agreement and at law, NABORS advises WHISTLER it must pay NABORS an amount of $6,011,753.95 by noon Monday December 7, 2015.

[9]  Nabors' shows this payment as being made on December 9, 2015, not December 15, 2015.  For purposes of the court's analysis, it does not matter which is the correct date.

[10]  Nabors' shows the letter of credit was drawn on December 14, 2015.  Again, it makes no difference to the court's analysis if it happened on December 14 or December 23.

### b.  The preference period activity

The preference period began on December 25, 2015 and ended on March 23, 2016 (the 90 days before the involuntary petition was filed on March 24, 2016).  On January 28, 2016 Whistler sent a check to Nabors in the amount of $496,634.62.  As discussed above, this check was received a few days later and cleared the bank on February 4, 2016.  Not having received the check immediately, Nabors sent a second letter, dated January 29, 2016, to Whistler.[11]  This letter stated that Nabors was very concerned about Whistler's past due account and stated that the amount of $4,536,067.73 was overdue.  This letter also contained a list of itemized invoices that were past due.[12] The letter also cited Article 8.2 of the contract between the parties and stated that Nabors was providing 10 days' notice of termination of the contract if payment of the overdue amounts was not received before the end of the 10 days' notice.  On February 8, 2016 Whistler sent a wire transfer in the amount of $1,500,000.00 to Nabors.

On February 11, 2016 the parties entered into an amendment to the contract.[13] The amendment provided that if Whistler paid Nabors $2,766,619.11 by the close of business on February 12, 2016, then Nabors would lower the day rate to $45,000.00 per day, both going forward and retroactive to December 16, 2015 and give Whistler a credit of $846,000.00.[14]  Whistler made the $2,766,619.11 payment on February 12, 2016 via wire transfer.  Nabors continued to provide services to Whistler, so additional charges

---

[11]   Trial Exhibit 20.
[12]   Because the letter was sent before the payment sent on January 28, 2106 was received, some of these invoices were paid by that check.
[13]   Trial Exhibit 18.
[14]   The credit of $846,000 represented the $18,000 retroactive reduction in the day rate from February 1, 2016 back to December 16, 2015.

accrued.  On March 9, 2016 Whistler made an additional payment to Nabors, also via wire transfer, in the amount of $1,040,765.07.

### c.  Analysis of the factors

The court finds that because the time that the parties were engaged in business transactions was relatively brief, the relevant time period to examine is the entire relationship between the parties, from the first invoice, which was dated November 3, 2014 and paid on December 3, 2014 to the date of the filing of the involuntary petition on March 24, 2016.  The court also finds that some payments were made by wire transfer, and some were made by check, both before and during the preference period, and this is not a significant factor in this case because the contract between the parties called for payment by either method, and both methods were used both before and during the preference period.

There is evidence to show that the amounts of the payments differed in that prior to the preference period, i.e., from December 2014 to September 2015, Whistler made payments that covered the full amount of the invoices it was paying, and then in the period immediately leading up to and during the preference period, i.e., from December 2015 forward, the debtor made partial payments.  Because the debtor was so far behind on its payments by December 2015, it may not have had any choice but to make only partial payments.  The court isn't sure that in this case, this is something to which great significance should be attached, but it does show that there was a difference in the course of dealing between the parties.

Whether the creditor engaged in any unusual collection activities is a closer call. The November 24, 2015 letter and the January 29, 2016 letter are evidence that Nabors

was engaging in some collection activity.  The November 24, 2015 letter asking the

debtor, who was over $6 million behind on its obligations, to make payment does not

strike the court as particularly egregious or unusual.  But the November 24 letter was not

sent during the preference period.  The January 29, 2016 letter is more aggressive.  It

threatens termination of the contract if payment is not received within 10 days, and it in

fact provides the 10-day notice required by the contract for termination.  Whistler

responded to this letter by engaging in the negotiation of an amendment to the contract

with Nabors, after which, the account was brought current and Whistler received a credit

to its account and more favorable account terms.  The Trustee also presented some

evidence that at the time of the transfers Whistler was feeling pressured from Nabors to

make payment.[15]

The court finds that these activities were not ordinary as between Whistler and

Nabors for purposes of the "subjective" prong of § 547(c)(2)(A).  Although there were

prior amendments to the contract, none were predicated on Whistler bringing its account

current, and none contained such a drastic reduction in the day rate.  There was evidence

of unusual collection practices, and there was evidence of the creditor pressuring the

debtor to pay through the threat of contract termination.

**2.  Section 547(c)(2)(B), or the "objective" test.**

Nabors also asserts that it satisfies the second prong of § 547(c)(2), that the payments

were made according to ordinary business terms.  This requires the court to examine the

industry in which the debtor and creditor operate to determine what usual or ordinary

business practices are in that industry.

---

[15]   Written deposition of Scott Frankel

Both Nabors and the Trustee presented evidence from an expert witness as to the ordinary business practices in the industry, which is oil and gas drilling and production. Both experts were highly qualified and credible.  Both agreed that in the time frame leading up to the preference period, the industry was in a downturn, with the price of oil falling significantly from approximately $100 per barrel to $30 per barrel.  There was testimony that several other companies in the industry had filed for protection under the Bankruptcy Code.  It is clear that the debtor was experiencing similar problems, being tight on cash and having less revenue coming in from production.

At trial the parties spent a lot of time presenting conflicting testimony and evidence about the number of days the debtor took to make its payments, and how those payments were applied.  Although under the caselaw, this is certainly a relevant factor, in this case the court does not find that it is determinative.

Here, Whistler was making regular payments until September 2015, and then stopped. When it began making payments again in December 2015, it was in response to the November 24, 2015 letter from Nabors.  It appears to the court that at this point Nabors and Whistler entered into good faith negotiations to repair a damaged commercial relationship.

Nabors' expert testified that he had examined many other oil and gas service companies operating in the Gulf of Mexico during the same time period.  He then narrowed his comparison to 15 other companies that were the most similar to the debtor. He further testified that 12 of those other 15 companies in the industry were also engaged in renegotiating service contracts due to the steep drop in oil and gas prices.  Nabors' expert testified that he found this information in public filings made by the companies

with the SEC; the public filings contained general information that these types of agreements were being renegotiated.[16]

Nabors' also offered testimony from Ernest Nelson, its vice-president of contracts who had extensive personal experience working in the oil and gas service industry for over 30 years.[17]  He testified that during previous downturns, service contracts such as the one between Whistler and Nabors are often renegotiated to provide rate reductions. He also testified that at the same time Nabors gave Whistler a rate reduction, Nabors was also negotiating rate reductions with other customers.

The Trustee's expert did not really dispute these characterizations of the industry, rather the Trustee objected that Nabors' expert was not able to provide specific information about renegotiated contracts referenced in public filings.  It is true that there is no easy way to find out the specific information that the Trustee demands, because these agreements are often confidential between the parties.  The court finds it highly likely that Nabors' expert is correct, and these types of renegotiated agreements were happening throughout the industry during this turbulent time period.

Nabors gave the debtor a very steep, below market discount going forward, in addition to a retroactive credit for some of the work it had already performed.  Nabors also allowed Whistler to increase its payment terms from 15 to 30 days in recognition of the fact that it was having some financial trouble.

The purpose of the ordinary course defense is to provide:

> [A] safe haven for a creditor who continues to conduct normal business on normal terms.  Without this defense, the moment that a debtor faced financial difficulties, creditors would have an incentive to discontinue all dealings with that debtor and refuse to extend new credit. Lacking credit, the debtor would face almost

---

[16]   Trial Exhibit 74-K contains the summary of this information.
[17]   Nelson was a fact witness, not an expert; he testified as to his personal experience in the industry.

insurmountable odds in its attempt to make its way back from the edge of bankruptcy.[18]

Nabors was essential to Whistler's continued operations. The services provided by Nabors could not be provided easily by another vendor.[19] Although Nabors was trying to get paid (as all creditors are), it was willing to work with and negotiate with Whistler to reach an accommodation that was favorable to Whistler. The court finds it particularly significant both that the payment term was extended from 15 to 30 days, and that the rate reduction was ongoing into the future, and not just a credit or discount on past due services because the policy behind allowing the ordinary course defense is to encourage creditors to continue dealing with and extending new credit to debtors facing financial difficulties in the hopes that bankruptcy may be averted.[20]

The Fifth Circuit Court of Appeals has held that the bankruptcy court must specifically examine the facts of each case to determine whether a business practice is ordinary:

> Because "ordinary business terms" sets an outer boundary to the parties' practices, the ultimate question is simply whether a particular arrangement is so out of line with what others do that it fails to be "according to ordinary business terms." We leave this case by case determination where it belongs—with the bankruptcy judge. We only say that the judge must satisfy himself or herself that there exists some basis in the practices of the industry to authenticate the credit arrangement at issue.[21]

The court finds that Nabors has shown that it has satisfied the "objective" test under § 547(c)(2)(B) of the Bankruptcy Code, and that under the facts presented here, for this

---

[18]  *In re Gulf City Seafoods, Inc.,* 296 F.3d 363, 367 (5th Cir. 2002).
[19]  Replacing Nabors would have required the demobilization of the drilling rig on Whistler's platform, and then a new rig belonging to a new contractor would have had to be assembled and installed. This is very expensive and time-consuming work.
[20]  *See In re Gulf City Seafoods, Inc.,* 296 F.3d 363 (5th Cir. 2002).
[21]  *In re Gulf City Seafoods, Inc.,* 296 F.3d 363, 369 (5th Cir. 2002).

particular industry in a significant downturn, the renegotiated contract on terms highly

favorable to the debtor constitutes an ordinary business practice in this industry.  The

court further finds that the two payments made pursuant to and following the amendment

to the contract, i.e., the $2,766,619.11 payment made on February 12, 2016, and the

$1,040,765.07 made on March 9, 2016, satisfy the "objective" test under § 547(c)(2)(B).

### B.  Subsequent new value defense under § 547(c)(4).

Section 547(c)(4) provides that the trustee may not avoid a transfer:

> [T]o or for the benefit of a creditor, to the extent that, after such transfer, such
> creditor gave new value to or for the benefit of the debtor—
> (A) Not secured by an otherwise unavoidable security interest; and
> (B) On account of which new value the debtor did not make an otherwise unavoidable
> transfer to or for the benefit of such creditor.

The parties agree that Nabors can avail itself of the defense; they disagree as to a few details with

respect to the fair market value of the new value given by Nabors, and the date from which the

giving of the new value should begin to be calculated.

Each side submitted an exhibit at trial showing its calculation as to the new value it

contends Nabors should be entitled to.[22]  The parties spent some time arguing about the date of

the first payment, and whether the court should use the January 28, 2016 date of the check, or the

February 4, 2016 date that the check cleared.  For purposes of § 547(c), a transfer involving a

payment by check is deemed to occur when the check is received by the creditor.  *Barnhill v.*

*Johnson,* 503 U.S. 363, 401, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992).  Here, there was no

evidence as to the exact date the check was received by Nabors.  The check cleared on February

4, 2018, and most banks would take a few days to clear a check of this amount.  The testimony at

trial showed that Whistler used a third-party company to mail its checks out from Dallas, and

---

[22]   Trial Exhibits 5 and 6.

that the check was mailed from Dallas to Nabors in Houston.  January 28, 2016 was a Thursday, and so it seems likely to the court that the check was received by Nabors around Monday, February 1, 2016, then deposited into the bank where it cleared on February 4, 2016.  The court finds that for purposes of this proceeding, Nabors received the check on February 1, 2016.[23]

The parties also disagree as to the value of the day rate for purposes of calculating the new value given by Nabors after it received the check.  The original contract between the parties, dated February 25, 2014, provided that Whistler was to pay Nabors a day rate of $65,000.00 per day.[24]  The rate in the contract was modified several times during the course of dealings between the parties.[25]  The parties executed an amendment to the contract effective March 5, 2015 that changed the day rate to $63,000.00 per day.[26]  Another amendment was made with an effective date of February 11, 2016 that reduced the day rate to $45,000.00 per day going forward.[27]  This amendment also gave Whistler a credit of $846,000.00, representing a reduction in the day rate of $18,000 per day from December 16, 2015 to January 31, 2016, provided that Whistler brought its past due payments to Nabors current by making a payment in the amount of $2,766, 619.11 no later than the end of business on February 12, 2016.  This amendment also provided that if Whistler made this February 12 payment, then Appendix A to the contract (which specified the day rate) would be replaced with a new Appendix A, dated February 1, 2016.  The new Appendix A specified that the day rate was $45,000.00 per day.  Whistler made the required payment on February 12, 2016, and the new rate went into effect.

---

[23]   Nabors makes the argument that because the Trustee used check date of January 28, 2016 in his complaint and in the joint pre-trial order submitted by the parties, the Trustee has somehow admitted that the receipt date of the check is January 28, 2016.  The court rejects this argument.
[24]   Trial Exhibit 14.
[25]   The first amendment to the contract did not change the day rate is and is not relevant to the new value defense.
[26]   Trial Exhibit 17.
[27]   Trial Exhibit 18.

Nabors argues that for purposes of the new value calculation, the court should use the $63,000.00 per day rate for the period from February 1, 2016 to March 23, 2016 because that was the market rate for the services it provided to Whistler.  The Trustee argues that the amended contract rate of $45,000.00 should be used because that is the invoiced rate.  The court agrees with Nabors that from February 1, 2016 to February 11, 2016, the date of the amendment to the contract, the market rate was the contract rate, $63,000.00.[28]  The amendment to the contract had a retroactive reduction in the day rate that went back to December 16, 2015, but the court finds that this was an attempt by Nabors to work out an arrangement with the debtor so that it could become current on its obligation and not necessarily a reflection of the market rate.

At trial, two witnesses testified on behalf of Nabors that the $45,000.00 rate was a below market rate.[29]  But Ernie Nelson also testified that the market was in decline during the time period in question.  The court agrees that $45,000.00 may have been below the market rate, but Nabors did not put on evidence as to what the proper market rate would be.  Given the decline in the market, it seems unlikely to the court that it would have been $63,000.00.  It was probably somewhere between $63,000 and $45,000.  But, Nabors bears the burden of showing the value of the services provided, and the court holds that it did not carry this burden.  With the information available to the court, the renegotiated contract rate of $45,000 is a sufficient indicator of value.  Accordingly, the court will fix the day rate for purposes of calculating the subsequent new value given at $45,000.00 from February 12, 2016 forward.

---

[28]   In the court's opinion, giving a retroactive discount or credit to Whistler is not the same as changing the contract rate going forward.

[29]   Testimony of Ernie Nelson dated March 26, 2019 at pp. 87-96 and 137-142; Exhibit 70, excerpt of testimony of Todd Fox, taken from a hearing held on December 13, 2016 in case number 16-10661 U.S. Bankruptcy Court for the EDLA (R.Doc. 637).

Trial Exhibits 5 and 6 contain the parties' calculations as to the new value amounts each is claiming.[30]  The amounts set forth in the exhibits are not in agreement, so the court will make its own calculations.  The court finds that the amount of the subsequent new value with respect to the day rate is as follows:  $63,000 x 11 = $693,000; and $45,000 x 38 = $1,710,000; thus, $693,000 + $1,710,000 = $2,403,000 for the day rate total.  There is no disagreement between the parties that the daily crane and quarters rate from February 1 to February 15, 2016 and March 1 to March 23, 2016 is $1,600 per day, so that is an additional $60,800.  There are undisputed overtime labor charges on February 19, 2016 in the amount of $852.93; February 25, 2016 in the amount of $6,276.93; and March 1, 2016 in the amount of $25,260.93; this results in an additional $32,390.79.  The invoices for the crane and quarters between February 16 and February 29, 2016 show a total of $17,300 less $774 for "crew shortage", plus there is $2,413.47 billed on February 1, 2016 for overtime labor.[31]  The court finds that the total amount of the subsequent new value defense is $2,512,776.79.  This shall be applied first to the January 28, 2016 payment in the amount of $496,634.62; then to the February 8, 2016 payment in the amount of $1,500,000.00; and finally, the remainder shall be applied to the February 12, 2016 payment.

## C.  Setoff

Nabors argues that it is entitled to receive a setoff against its allowed administrative claim.  The Trustee does not argue otherwise, and the case law cited by Nabors in its argument is on point.[32]  Although the holding of the court obviates the necessity for a setoff, in the event

---

[30]  Trial Exhibit 5 is the Trustee's calculation of the new value defense, and Trial Exhibit 6 is Nabors' calculation of the value of the new value defense.

[31]  The Trustee disputes these amounts, and his calculations are slightly less.  He does not, however, explain why he disputes these amounts, and in the absence of evidence to the contrary, the court holds that the invoiced amounts should be used to make the calculations.

[32]  *In re Alfar Dairy, Inc.,* 458 F.2d 1258 (5th Cir. 1972, cert. denied, 409 U.S. 1048, 93 S.Ct. 517 (1972); *In re Quantum Foods, LLC,* 554 B.R. 729 (Bankr.D.Del. 2016).

some, or all, of the court's holding is overturned on appeal, the court finds that Nabors is entitled to a setoff.  Nabors has been allowed an administrative claim in the amount of $897,024.  It may use this amount as a setoff against any preference amount it may be required to return to the Trustee.  Additionally, the Fifth Circuit Court of Appeals has remanded to this court for further consideration this court's order regarding Nabors' claim for administrative expense.  That matter has not been fully briefed, but if Nabors becomes entitled to an additional administrative claim, it may also receive a setoff of that amount.  Nabors would not be required to make any payment to the Trustee until the administrative claim is the subject of a final order.

### III.    Conclusion

The court finds that Nabors has shown it is entitled to an ordinary course of business defense for the payments made pursuant to and following the amendment to the drilling contract, i.e., the payment of $2,766,619.11 made on February 12, 2016, and the payment of $1,040,765.07 made on March 9, 2016.  Nabors has also prevailed on its subsequent new value defense.  The amount of credit that Nabors shall receive for its new value defense is $2,512,776.79.  This shall be applied first to the January 28, 2016 payment, then to the February 8, 2016 and February 12, 2016 payments.  Because Nabors' two defenses insulate it from repayment of the full amount of the preference payments the Trustee seeks to recoup, Nabors is not required to return any of these funds to the Trustee.  A separate judgment will be entered.

New Orleans, Louisiana, November 4, 2019.

*J. A. Brown*

Jerry A. Brown
U.S. Bankruptcy Judge